*927 DICKINSON; Presiding Justice,
dissenting:
¶ 95. Crawford’s central defense theory was insanity. Through his own testimony, and that of his mother and ex-wife, Crawford presented compelling evidence that he was legally insane. The State' presented evidence to the contrary in rebuttal, setting up an important dispute of fact for the jury to resolve.
¶ 96. But the jury was ill-equipped to do so because the circuit judge failed adequately and correctly to instruct the jury on the burden of proof related to insanity. The judge gave instructions which, when fairly read, stand in conflict with one another, and which, even when subjected to a stretched and contorted reason, are at best so confusing that no jury could adequately understand the law to apply it to the facts.
¶ 97. So, because the judge’s error precluded the jury from adequately considering Crawford’s primary defense, I respectfully dissent.
CRAWFORD’S EVIDENCE OF INSANITY
¶ 98. At trial, Johnnie Smith — Crawford’s mother — testified that when Crawford was a child he struggled to sleep because he heard voices. So she took Crawford to a child psychologist or psychiatrist, who prescribed him medicine to sleep at night.
¶ 99. Around age sixteen or seventeen, Crawford began to experience violent episodes. During those episodes, his personality'would suddenly change. One minute he would be acting perfectly normal, then the next, he would be unable to control what he was doing. These spells would last anywhere from twenty minutes to an hour. Crawford would have a blank glare, like he was in a daze, and his pupils would shrink to the size of pinheads. The spells were often preceded by a week or two of depression, during which time Crawford would not leave the house and would black out the windows. After the spells were over, Crawford couldn’t remember what he had done. .
¶100. Because of this problem, Crawford was confined to a mental hospital for thirty days in-1988 or 1989, then again in 1991, and he received mental-health treatment for two years from a psychologist, Dr. Hutt, who prescribed, him lithium to control his episodes. He was diagnosed as manic depressive. Crawford’s mother also testified that she believed Crawford’s condition made him a danger, and that the problem had worsened with age. She considered him mentally ill and believed that he was having one of his spells the night of this crime.
¶ 101; Gail Crawford — one of Crawford’s ex-wives — testified that; her marriage with Crawford had ended-because of his mental-health problems, and particularly because he would leave her and their child for weeks at a time. She described spells when Crawford would -have headaches, wake up screaming and shaking in the night, and become violent.
¶ 102. She detailed a particular incident in which Charles starting crying and shaking, grabbed her, and began choking her, saying that she couldn’t leave him and take his baby. She explained that they split up but got back together after Crawford had a stay in the hospital and was prescribed medication for his condition, but that he eventually stopped taking the medication. She also believed that Crawford’s actions in this crime mirror his‘actions during his prior spells. She explained that he often comes out of these spells apologetic and unsure of what he has done.
¶ 103. Crawford testified that he was being housed in the psychiatric ward at Parchman. There he received treatment *928 from a psychiatrist, Dr. Stanley Russell. He explained that his psychiatric problems went as far back as he could remember. He explained that, in 1989, he had a six-weeks hospitalization, and that he was prescribed lithium and desyrel. He explained that he was formally diagnosed with manic depression, or bipolar disorder. He explained that he also was hospitalized in 1991 and was prescribed lithium and dicy-clomine.
¶ 104. He also had received treatment from a private psychologist. He testified that one doctor told him that he showed no signs of faking his illness. He explained that the spells his family described have been happening as long as he can remember, but they have become progressively worse with age. He explained that the spells come with gaps in his memory, and that they sometimes are preceded by severe headaches and blurred vision. He also explained that he has had some seizures.
ANALYSIS
¶ 105. At trial, the circuit judge granted jury instruction S-8 defining insanity over Crawford’s objection. Both at trial and on appeal, Crawford’s counsel has argued that this instruction improperly shifted the burden of proof to him. I agree, so I would reverse his conviction and remand for a new trial.
¶ 106. This Court has long held that the burden of proof in a criminal case never shifts to the defendant, and that the State ultimately bears the burden to prove that a defendant is sane at the time of the crime.[9] But this Court has also long explained that each defendant is presumed sane, and that no evidence of sanity need be offered unless the evidence produced at trial creates reasonable doubt as to the defendant’s sanity.[10] It is only then that the State need prove beyond a reasonable doubt that the defendant is sane.[11]
¶ 107. Some of this Court’s insanity cases, however, have begun their articulation of the M’Naghten test with the phrase “it must be clearly proved.”[12] Por example, in White v. State, this Court stated:
In Mississippi to establish the defense of insanity, it must be dearly proved that at the time of committing the act the party accused was laboring under such defect of reason from disease of mind as to not know the nature and quality of the act he was doing or, if he did know it, that he did not know it was wrong.[13]
The jury instruction at issue in this case mirrored that language. It stated:
THE COURT instructs the jury that the defendant, CHARLES RAY CRAWFORD, has raised the defense of insanity in this case. The terms and concepts of “sanity” and “insanity” as used in the jury instructions and in this case are legal terms and concepts and not medical terms.
The legal test for insanity under the law of the State of Mississippi is referred to as the M’Naghten Rule. The M’Naghten Rule states: to establish a *929 defense on the ground of insanity, it must be clearly proved that at the time of committing of the act for which the defendant has been indicted that the defendant was laboring under such defect of reason from disease of the mind as to not know the nature and quality of the act the defendant was doing, or, if the defendant did know the nature and quality of the act, that the defendant did not know it was wrong.
Stated more succinctly, the test for insanity is whether the defendant was unable to distinguish right from wrong at the time the act was committed.
The question of insanity is for the jury to determine. Furthermore, the jury is not bound by any expert’s testimony and may accept or reject it in whole or in part.
The Court instructs the jury that even should you find that the defendant was suffering from a mental illness, an emotional problem, or some other condition or problem which could be classified as a “disease of the mind,” you may not find the defendant not guilty by reason of insanity unless you also find from all of the evidence in this case that the defendant’s condition left the defendant unable to distinguish right from wrong at the time the act was committed.
¶ 108. While this jury instruction mirrors language that has been used in this Court to describe the M’Naghten test, it does not conform to this Court’s articulation of the burden of proof in insanity cases. The instruction clearly and improperly shifted the burden to Crawford. In White, in which this Court used the language mirrored by the instruction, the Court went on to explain thoroughly the burden of proof in these cases.[14] The Court stated that:
There is a presumption that an accused is sane and, therefore, the burden is initially on the accused to introduce evidence creating a reasonable doubt as to his sanity at the time of the act. However, once the accused has overcome this initial burden, it is the burden of the State to present sufficient evidence to prove the accused’s sanity beyond a reasonable doubt.[15]
¶ 109. While the defendant bears the initial burden to create reasonable doubt as to his sanity, the State ultimately bears the burden to prove that the defendant is sane. And there is a substantial difference between instructing the jury that the defendant must first create reasonable doubt, and that it must be clearly proven that the elements of M’Naghten insanity exist.
¶ 110. Said differently, it strains reason to say that this instruction merely referenced the initial burden the defendant bears to create reasonable doubt because the defendant need only create some reasonable doubt, not establish all of the M’Naghten elements. And it is equally unreasonable to say that this instruction never explicitly says the defendant bears the burden because, logically, only a defendant would endeavor to prove he is insane.
¶ 111. That said, jury instructions must be read as a whole to determine whether they adequately instruct the jury on the relevant law.[16] Jury instruction S-4 stated that if the jury found the elements of rape proved beyond a reasonable doubt, it must find the defendant guilty unless the State “failed to prove beyond a reasonable doubt that the defendant, CHARLES RAY *930 CRAWFORD', was sane at the time the defendant committed the rape.”
¶112. While this instruction properly placed the burden on the State to prove sanity, the instructions read as a whole do not adequately instruct the jury. Conflicting instructions. do* not properly instruct the jury.[17] The majority opinion stands in stark contrast to this principle. Here, one instruction put the burden on the State to prove sanity beyond a reasonable doubt and another put the burden on the defendant clearly to prove insanity. “It is well settled that it is reversible error to give contradictory or conflicting jury instructions.”[18] But today’s majority concludes that conflicting jury instructions are of no concern because the Court assumes that the jury will select the correct one without any guidance to do so. So I respectfully dissent..
KITCHENS AND KING, JJ„ JOIN THIS OPINION.

. Williams v. State, 205 Miss. 515, 527-28, 39 So.2d 3, 6 (1949).

. Cunningham v. State, 56 Miss. 269, 276 (1879).

. Id.

. M'Naghten's Case, 8 Eng. Rep 718, 10 Cl & F. 200, 1 Car. & Kirw. 130 (H.L.1843); White v. State, 542 So.2d 250, 252 (Miss. 1989) (citing United States v. McCracken, 488 F.2d 406 (5th Cir.1974); Edwards v. State, 441 So.2d 84 (Miss. 1983); Palmer v. State, 427 So.2d 111 (Miss. 1983)).

. White, 542 So.2d at 252 (citing McCracken, 488 F.2d at 406; Edwards, 441 So.2d at 84; Palmer, 427 So.2d at 111) (emphasis added).

. White, 542 So.2d at 252.

. Id. (internal citations omitted) (emphasis added).

. Williams v. State, 134 So.3d 732, 737 (Miss.2014) (quoting Clark v. State, 40 So.3d 531, 544 (Miss.2010)),

. Elam v. Pilcher, 552 So.2d 814, 817 (Miss.1989).

. Id.